1

2

3

4

5              UNITED STATES DISTRICT COURT

6            NORTHERN DISTRICT OF CALIFORNIA

7

8  ARNOLD AGUIRRE,                    No. C 09-763 MHP

9          Plaintiff,                 **ORDER GRANTING DEFENDANTS'**
                                       **MOTION FOR SUMMARY**
10     v.                             **JUDGMENT**

11 V. MUNK, D.D.S.; et al.,

12         Defendants.
   _____/

13

14                      **INTRODUCTION**

15        In this <u>pro se</u> prisoner's civil rights action, Arnold Aguirre alleged that defendants

16 were deliberately indifferent to his serious dental and medical needs during the period from

17 December 6, 2007 through February 2008.  Defendants now move for summary judgment

18 and plaintiff opposes the motion.  For the reasons discussed below, the court will grant the

19 motion and enter judgment in favor of all defendants.

20                      **BACKGROUND**

21        Throughout the parties' filings, they refer to teeth by numbers.  These references are

22 based on a standardized numbering system that dental care providers use, with each tooth

23 having a corresponding number.  The top teeth are numbered 1-16, starting with the back-

24 most tooth on the right; the bottom teeth are numbered 17-32, starting with the back-most

25 tooth on the left.  The main teeth at issue here are teeth 30-32, the backmost teeth on the

26 lower right side of the mouth.

27        The following facts are undisputed unless otherwise noted.

28        The acts and omissions complained of in the amended complaint occurred during

December 2007, and January and February 2008.[1]

United States District Court
For the Northern District of California

1   Plaintiff Arnold Aguirre was an inmate at Salinas Valley State Prison.  Aguirre is "not

2   a dentist, or a doctor" and has "no medical training or expertise."  Opposition Ex. 2

3   (hereinafter "Aguirre Decl."), ¶ 27.  Aguirre has had numerous dental problems throughout

4   his 29 years of incarceration, and now has less than half of his original teeth.  Aguirre has

5   advanced periodontal disease and upper partial dentures.

6   Defendant V. Munk, D.D.S., was licensed to practice dentistry.  He was employed by

7   the California Department of Corrections ("CDCR") and served as a dentist at Salinas Valley.

8   Defendant Robert Bowman, M.D., was licensed to practice medicine.  He was

9   employed by the CDCR as a physician and worked at Salinas Valley.

10   Defendant C. Lee was employed as "chief medical officer and health care manager" at

11   Salinas Valley.  Amended Complaint, p. 2.

12   Defendant J. Adamo was employed as the "chief dental officer" at Salinas Valley. Id.

13   Unserved defendant "Moses" was a nurse with whom Aguirre communicated at

14   Salinas Valley on January 31 - February 3, 2008.[2]

15   Salinas Valley has dental clinics at which inmates' dental needs are addressed.  The

16   dental clinics "emphasize good infection control measures."  Munk Decl., ¶ 10.  The

17   clinicians use face masks, gloves, gowns and disposable saliva ejectors, and clean dental

18   chairs after each patient.  Disposable items (such as the tip of the saliva ejector suction

19   device) are discarded and used non-disposable dental instruments are put in an autoclave for

20   sterilization after each patient.  The dental office at Salinas Valley did not have a "spit sink"

21   for patient use.  "[I]n SVSP dental clinics as in most modern dental offices, irrigation and

22   rinsing now are accomplished with a device that sprays water into patients' mouths and a

23   suction tube, rather than using the old fashioned spit sink method.  This constitutes

24   advancement of dental technology rather than substandard care."  Munk Decl., ¶ 9.

25   Dr. Munk treated Aguirre at the dental clinic on several occasions in 2007-2008.  On

26   November 19, 2007, Dr. Munk extracted teeth # 27, # 28 and # 31 (lower right teeth) from

27   Aguirre's mouth due to an acute infection.

28

**United States District Court**
For the Northern District of California

1     A.     <u>The December 6, 2007 Dental Visit</u>

2        On December 6, 2007, Aguirre went to the dentist for a full exam that had been

3 recommended at an appointment in September.  Dr. Munk "performed a complete

4 examination of [Aguirre's] mouth, including taking x-rays of [his] full mouth."  Aguirre

5 Decl., ¶ 9.  Dr. Munk noted that Aguirre had heavy calculus (i.e., tartar), red gingivitis, and

6 mobility of teeth # 19, # 30 and # 32.  He also noted that Aguirre had severe bone loss

7 around teeth # 6 and # 11.  His assessment "was that Mr. Aguirre had moderate to advanced

8 periodontitis, and that his teeth nos. 19, 30, and 32 were unsuitable abutments for lower

9 partial dentures."  Munk Decl., ¶ 7.  Dr. Munk recommended extraction of teeth # 30 and #

10 32.  He told the patient to report any problems that might arise with teeth # 6 and # 11, and

11 that teeth # 30 and # 32 would be extracted at the next visit.  By December 6, Aguirre's

12 "acute conditions" had been addressed, and his chronic conditions were to be addressed later.

13 <u>See</u> Opposition Ex. 10 (Munk's Responses To Plaintiff's First Set Of Interrogatories,

14 Response Nos. 21 and 24).   A health care request form for that day has notations stating

15 "NV ext. # 30, 32" and "1B;" "NV" meant next visit, and 1B meant it was to be scheduled

16 within 30 days.  <u>See</u> Aguirre Decl., ¶ 5 and attachment C-1.[3]

17        Dr. Munk wrote in his treatment notes that the inmate pointed to the lingual (i.e.,

18 tongue) side of tooth # 27 where there was a hard-knot like spot that did not hurt.  Dr. Munk

19 examined the area and observed "a mandibular torus, which is a common condition in which

20 a bony protrusion is evident in the jaw along the surface nearest the tongue.  The mandibular

21 torus exhibited no signs of infection or other pathology."  Munk Decl., ¶ 6.  Dr. Munk

22 thought that Aguirre "simply was noticing the bone architecture more at that location due to

23 the absence of tooth # 27."  <u>Id.</u>  Dr. Munk "did not prescribe antibiotics or make a physician

24 referral to treat any infection because no antibiotics or referral were medically indicated for

25 such a chronic condition."  <u>Id.</u>  Antibiotics "were not indicated because: (a) what Mr. Aguirre

26 thought was an infection was not an infection, and (b) although his chronic periodontitis

27 technically constituted an infection, the standard of care did not (and does not) indicate

28 initiation of antibiotic therapy for such a condition."  <u>Id.</u>

United States District Court
For the Northern District of California

1   The parties agree that no pain medications were ordered at the appointment, but

2   disagree as to whether Aguirre told Dr. Munk he was in pain.  Aguirre states that he "told Dr.

3   Munk that [his] back teeth (later designated as nos. 30, 32) were really hurting and

4   abscessed. [He] pointed out the swelling of the gums around these teeth."  Aguirre Decl., ¶

5   10.  Although he testified at the deposition that he thought, but was not sure, that he asked for

6   pain medications, Aguirre Depo., RT 32, Aguirre stated in his declaration that he did ask for

7   pain medications and that Dr. Munk told him that he "wasn't hurting that bad and didn't need

8   them." Aguirre Decl., ¶ 11.  Aguirre was able to, and did, buy aspirin at the prison canteen

9   for pain relief.  Aguirre Depo., RT 32; cf. Opposition Ex. 6 at ¶ 3 (cellmate's declaration that

10  Aguirre "had some pain medications, ibuprofen, I think, but they did not seem to help him

11  any").  Dr. Munk did not note any complaint of pain in his progress notes; he also stated that

12  pain medication "was not indicated because Mr. Aguirre did not appear to be in any

13  significant discomfort and did not report experiencing any."  Munk Decl., ¶ 7.

14  When asked what Dr. Munk did wrong at the December 6, 2007 visit, Aguirre

15  responded: "Nothing really.  The only thing he did was just, like I said, postponed the . . .

16  extractions."  Aguirre Depo., RT 30, 34.

17  B.   Events After December 6, 2007 Visit

18  Aguirre did not know who was responsible for scheduling dental exams.  Aguirre

19  Depo., RT 36.  He submitted to nurse Moses a request for dental treatment on December 13,

20  2007, in which he complained of dental pain.  He submitted more requests complaining of

21  pain to an unidentified person on December 28, 2007, and on January 5, 12, and 19, 2008.

22  Other inmates heard and saw Aguirre make requests to nurse Moses and/or an unnamed

23  nurse while Aguirre was in his cell.  Opposition Exs. 4-6.  His wife made a one-minute call

24  and a two-minute call on January 29 during which she told unidentified prison staff to help

25  get Aguirre dental care.  Opposition Ex. 3. There is no evidence any defendant (other than

26  nurse Moses) was made aware of Aguirre's requests.  Moses "failed to call or contact the on

27  call physician for instructions, nor did he make any other nursing staff aware of plaintiff's

28  condition."  Complaint, p. 7.

C.      Teeth Extractions on January 30, 2008

        On January 30, 2008, Aguirre was summoned to the dental clinic.  Aguirre reported experiencing pain in his mouth's lower right quadrant and pointed to tooth # 30.  Dr. Munks' evaluation confirmed that teeth # 30 and # 32 were mobile and unsuitable for abutments with partial dentures.  Dr. Munk then extracted teeth # 30 and # 32.   At that time, Aguirre had advanced periodontitis and heavy calculi.  No new x-rays were done that day.    Following the extraction, Dr. Munk prescribed penicillin and ibuprofen.  Dr. Munk prescribed these to ward off infection and to ameliorate any pain or discomfort.  "Providing antibiotics prior to such a procedure is not medically indicated.  (Indeed, many dentists provide no antibiotics either prior to or after such a procedure.)  However, the post-procedure provision of penicillin has been shown to reduce the incidence of infection."  Munk Decl., ¶ 11.  Aguirre did not receive the medications until about 36 hours later.  Aguirre Decl., ¶ 16; but see verified Complaint at 5 (dentist sent him back to his cell with pain medication).

        Aguirre took the antibiotics "every day until [he] went out to the hospital" on February 4, 2008.  Aguirre Decl., ¶ 16.

D.      The Days Following The Extraction

        On February 1, 2008, Aguirre "began feeling light-headed and feverish."  Id. at ¶ 17. He thought he was catching the flu and noticed the side of his face was swelling up so he "doubled up on the antibiotics hoping they would help."  Id.  Aguirre – whose housing unit was on lockdown – complained to nurse Moses, who told him to fill out a sick call slip.

        Aguirre submitted a treatment request form on February 2, 2008.  That form did not mention the recent dental procedure and instead stated, "I'm unable to swallow.  I have a swelled throught.  I think its my tonscills.  I started off as a flu or a severe cold.  Please call me as soon as possible.  Thank you.  My tounge is very swelled."  Aguirre Decl., attachment S (errors in source).  That form was marked as received at 8:00 p.m. on February 3 and as reviewed at 7:15 a.m. on February 4.

        Aguirre submitted another treatment request form to the nurse on February 3, 2008, again requesting help because his throat and tongue were swollen; he wrote that he couldn't

United States District Court
For the Northern District of California

swallow, couldn't talk, felt dizzy and needed an IV. <u>see</u> Aguirre Decl., ¶ 19, attachment T. That form was returned with a notation in red ink "there's no doc. on weekends." <u>Id.</u>

Several times on February 1, 2 and 3, Aguirre tried to obtain medical help by talking to nurse Moses, and showing nurse Moses the swelling on his neck and face and telling him he could not eat, breath or speak properly.  Nurse Moses said there was no doctor at the facility to see him because it was Superbowl weekend.

During this time, Aguirre developed an infection in his mouth that turned into Ludwig's Angina.  Ludwig's Angina is a relatively serious, mouth floor connective tissue bacterial infection.  Dr. Munk opined that the infection and Ludwig's Angina that Aguirre developed after the extractions "was not due to any failure to meet the standard of care." <u>Id.</u> at ¶ 12.  Dr. Munk explained that "infection is an inherent risk of the [extraction] procedure because the procedure disrupts the integrity of the mucous membrane lining the mouth, facilitating the introduction of bacteria (which are ubiquitous) into the tissue beneath."  Dr. Munk stated that Ludwig's Angina "has become increasingly rare with the advent of antibiotics, causing [him] to question whether Mr. Aguirre took those given to him, though the condition admittedly can occur even with antibiotics." <u>Id.</u>  Due to the speed at which such infections develop, Dr. Munk thought it unlikely that Aguirre was noticing symptoms of infection mere hours after the procedure, and that it was more likely that infection symptoms first appeared a couple of days after the procedure. <u>Id.</u> at ¶ 13.[4]  Swelling and discomfort that Aguirre may have noticed prior to 2-3 days after the January 30 procedure "probably were due to the extractions themselves rather than an incipient infectious process." <u>Id.</u>

E.     <u>February 4, 2008 Events and Hospitalization</u>

On February 4, 2008, Aguirre gave a note to an inmate clerk stating he needed medical attention.  The nurse visiting the housing unit saw Aguirre's condition and sent him to the clinic for medical care.  Aguirre walked to the clinic with other inmates in need of care.   At the clinic, Aguirre was evaluated and sent to the correctional treatment center ("CTC"), which apparently functions as an emergency room for the prison.

Shortly after he arrived at the CTC, Aguirre was examined by defendant Dr. Bowman,

United States District Court
For the Northern District of California

a physician with a surgical background who had been summoned to evaluate Aguirre at about 9:50 a.m.  Aguirre had a temperature of 103.4' and appeared uncomfortable but was not in respiratory distress.  "Particularly in light of his fever, swelling in the sublingual area and history of recent tooth extraction, [Dr. Bowman] diagnosed Ludwig's Angina, which is a mouth floor connective tissue bacterial infection."  Bowman Decl., ¶ 4.  Bowman approved Aguirre's receipt of Benadryl to reduce inflamation and a normal saline IV.  Bowman thought no other medications were then necessary, especially since Aguirre was going to be sent to a hospital and additional medications could interfere with the hospital physicians' treatment plans.

The parties agree that the first ambulance that was called to take Aguirre to the hospital was cancelled, but disagree as to whether Bowman cancelled the initial ambulance request.  Aguirre presented evidence that would support the view that Bowman cancelled the ambulance that had been called.  Bowman declares that there was a misunderstanding:

> Because the CTC was not equipped to treat Mr. Aguirre's condition sufficiently, the plan I developed within a few minutes of examining Mr. Aguirre was to have an ambulance transport him to Natividad Medical Center (NMC).  My plan never changed thereafter. . . . [¶]  I said something in the CTC that morning to reflect my desire that SVSP Chief Dental Officer J. Adamo, D.D.S., have an opportunity to evaluate Mr. Aguirre before Mr. Aguirre was placed in the ambulance.  I wanted Dr. Adamo to briefly evaluate Mr. Aguirre because I thought the dental procedure performed on Mr. Aguirre may have contributed to the infection, and I wanted Dr. Adamo to be attuned to any implications that might have because he oversaw the dental department.  By this, I do not mean to imply the dental treatment Mr. Aguirre received on January 30 was in any way deficient.  Ludwig's Angina certainly is something that can happen in the absence of dental negligence.  A patient's poor dental hygiene alone can cause it.  In fact, because I understand Mr. Aguirre received penicillin following the extraction of the teeth, I am somewhat surprised – assuming he took it – that it did not prevent his infection.  [¶] I was confident that having Dr. Adamo briefly evaluate Mr. Aguirre would not pose any risk of harm.  I knew allowing Dr. Adamo to examine Mr. Aguirre would take only a matter of minutes because his office was only about 30 yards down the hall.  I also knew it would take time for a security team to assemble.  (Policy required a security team to accompany inmates being transported off-site.)  Further, Mr. Aguirre was stable and experiencing no respiratory distress, as indicated in my progress note from that morning. . . . [¶] Although my unwavering plan once I had examined Mr. Aguirre was to transport him to NMC via ambulance, medical records suggest my words were interpreted otherwise.

Bowman Decl., ¶¶ 5-9.  The first ambulance was cancelled at 9:55 a.m. and the second ambulance was called eight minutes later, at 10:03 a.m.  The ambulance arrived at the CTC

1  by 10:30, two minutes before the security team necessary to escort Aguirre out of the prison

2  had assembled.  Dr. Bowman does not believe the ambulance confusion caused any delay

3  because the ambulance that eventually arrived still got there before the security team was

4  ready, according to the medical records.  Id. at ¶ 10.  Dr. Bowman also opined that the course

5  of Aguirre's hospitalization would not have proceeded differently in any meaningful way if

6  he had arrived at the hospital 5-30 minutes earlier.  Id. at ¶ 11.

7          Dr. Bowman interpreted the medical records from NMC to describe the sequence of

8  events once Aguirre arrived at the hospital.   Aguirre was processed and placed in a bed in

9  the emergency department by 11:15 a.m. and was in the emergency department for about two

10 hours.  He was taken to the operating room at about 1:30 p.m.  While in the emergency room,

11 Aguirre was examined and treated for about an hour by an emergency room physician and

12 ear, nose and throat specialist Robert Block, M.D.  Various diagnostic tests were performed.

13 Ludwig's Angina was diagnosed by the hospital doctors.  Clindamycin was ordered to

14 combat the infection and Decadron was administered to reduce inflammation.  Dr. Block's

15 reported plan was to perform nasotracheal intubation to secure the airway, with a

16 tracheotomy and incision and drainage of the abscess.  Follow-up procedures to further drain

17 the infection were performed on February 6 and 8.  Dr. Block discharged Aguirre on

18 February 13, with orders for the antibiotic Augmentin and Vicodin. By the time he left the

19 hospital, his tracheotomy tube had been removed, and he was eating a regular diet.

20 F.    Aguirre Returns To Prison

21         When Aguirre returned to the prison on February 13, Dr. Bowman saw him at the

22 CTC.  Dr. Bowman ordered Augmentin, just as Dr. Block had done.  Instead of Vicodin,

23 however, Dr. Bowman ordered morphine sulfate (15 mg. three times a day, as needed, for 14

24 days) because "it provides more effective pain relief than Vicodin."  Bowman Decl., ¶ 13.

25 Dr. Bowman ordered that Aguirre be returned to the CTC the next day for follow-up

26 evaluation.  Dr. Bowman signed a "comprehensive accommodation chrono" dated February

27 13, that ordered that Aguirre be housed on the ground floor in a bottom bunk for two months.

28 On that same form, Bowman marked "no" in response to the question, "Based on the above,

8

are there any physical limitations to job assignments?"  Aguirre Decl., attachment X.

Aguirre returned to the CTC on February 14 or 15.  At that time, Dr. Bowman ordered two weeks of daily dressing changes and showers, and ordered a one-week lay in so Aguirre could skip work.  Aguirre states that he never "received" the seven day lay-in and had to go to work on February 15, 2008.

Several months later, Aguirre felt some tightness or pulling at the tracheostomy site due to the manner in which the scar healed.  A minor procedure was done to revise the scar.

**VENUE AND JURISDICTION**

Venue is proper in the Northern District of California because the events or omissions giving rise to the claims occurred in Monterey County, which is located within the Northern District.  See 28 U.S.C. §§ 84, 1391(b).  This Court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983.  See 28 U.S.C. § 1331.

**LEGAL STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  A fact is material if it might affect the outcome of the action under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts

9

1  showing that there is a genuine issue for trial.'" <u>Celotex</u>, 477 U.S. at 324 (citations omitted).

2      A verified complaint may be used as an opposing affidavit under Rule 56, as long as it

3  is based on personal knowledge and sets forth specific facts admissible in evidence.  <u>See</u>

4  <u>Schroeder v. McDonald</u>, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's

5  verified complaint as opposing affidavit where, even though verification not in conformity

6  with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and

7  correct, and allegations were not based purely on his belief but on his personal knowledge).

8  Aguirre's verified complaint is considered as evidence in opposition to defendants' motion.

9  His unverified amended complaint is not considered as evidence.

10      The court's function on a summary judgment motion is not to make credibility

11  determinations or weigh conflicting evidence with respect to a disputed material fact.  <u>See</u>

12  <u>T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987).  The

13  evidence must be viewed in the light most favorable to the nonmoving party, and the

14  inferences to be drawn from the facts must be viewed in a light most favorable to the

15  nonmoving party.  <u>See</u> <u>id.</u> at 631.

16                          **DISCUSSION**

17  A.      <u>Eighth Amendment Claim</u>

18      Deliberate indifference to a prisoner's serious medical needs violates the Eighth

19  Amendment.  <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976).  A prison official violates the

20  Eighth Amendment only when two requirements are met: (1) the deprivation alleged is,

21  objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent

22  to the inmate's health or safety.  <u>See</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994).

23      A "serious" medical need exists if the failure to treat a prisoner's condition could

24  result in further significant injury or the "unnecessary and wanton infliction of pain."  <u>Id.</u>

25  Serious medical needs may include dental care needs.  <u>See</u> <u>Hunt v. Dental Dep't.</u>, 865 F.2d

26  198, 200 (9th Cir. 1989) (dental care important medical need of inmates).  A prison official

27  exhibits deliberate indifference when he knows of and disregards a substantial risk of serious

28  harm to inmate health.  <u>See</u> <u>Farmer</u>, 511 U.S. at 837.  The official must both know of "facts

from which the inference could be drawn" that an excessive risk of harm exists, and he must actually draw that inference.  Id.  A mere difference of opinion as to which medically acceptable course of treatment should be followed does not establish deliberate indifference. See Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).  Where doctors have chosen one course of action and a prisoner-plaintiff contends that they should have chosen another course of action, the plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances, . . . and the plaintiff must show that they chose this course in conscious disregard of an excessive risk to plaintiff's health."  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations omitted).

     1.    Serious Medical Needs?

The evidence in the record shows that Aguirre complained of dental pain, that he had two teeth extracted, and that he developed an infection after the extraction.  The evidence suffices to raise a triable issue of fact as to the existence of severe and chronic dental problems that amount to an objectively serious medical condition.  The evidence easily suffices to show that the Ludwig's Angina/ infection was a serious medical condition.

Aguirre does not, however, provide sufficient evidence to allow a reasonable jury to find that he had the specific dental condition of an abscess on one or more teeth on December 6, 2007 when he was examined by Dr. Munk.  Dr. Munk examined Aguirre and determined that Aguirre had a mandibular torus near former tooth # 27, as well as tartar, red gingivitis and mobility of teeth # 30 and # 32.  Against the dentist's diagnosis upon examination of the patient, Aguirre's untrained lay opinion that what was really in his mouth was an abscess rather than a mandibular torus near tooth # 27 and advanced periodontal disease with red gingivitis and tartar around teeth # 30 and # 32 does not raise a triable issue of fact.

Similarly, Aguirre's untrained lay opinion that he should have been given antibiotics at the December 6 appointment or before the January 30 teeth extraction is insufficient to show a triable issue of fact, especially in light of the dentist's professional opinion that antibiotics were not medically indicated for Aguirre's chronic condition on December 6, nor were they medically indicated prior to the teeth extraction procedure on January 30.

United States District Court
For the Northern District of California

2.     Deliberate Indifference?

When, as here, the prisoner seeks damages against individual defendants, the "inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." Leer v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988). Leer explained that "it is important to distinguish the causal connection required when a plaintiff seeks injunctive or declaratory relief as opposed to damages." Id. In the former case, a broader and more generalized approach to causation is taken. Id.

> When plaintiffs, such as the inmates, seek to hold an individual defendant personally liable for damages, the causation inquiry between the deliberate indifference and the eighth amendment deprivation must be more refined. We must focus on whether the individual defendant was in a position to take steps to avert the [harm], but failed to do so intentionally or with deliberate indifference. In order to resolve this causation issue, we must take a very individualized approach which accounts for the duties, discretion, and means of each defendant. . . . Sweeping conclusory allegations will not suffice to prevent summary judgment. …The prisoner must set forth specific facts as to each individual defendant's deliberate indifference.

Id. at 633-34 (citations omitted) (emphasis added). A defendant health care provider thus would not have exposure for every shortcoming in the medical or dental department at Salinas Valley, but only if he personally was deliberately indifferent.

Dr. Munk: Aguirre presents no evidence to show or support a reasonable inference of deliberate indifference by Dr. Munk in his response to Aguirre's dental problems during the time period December 6, 2007 through February 2008 (i.e., the time frame alleged in the first amended complaint). Aguirre has failed to provide any competent evidence to show that he actually had an abscess or that antibiotics were medically necessary or appropriate at the December 6 appointment. There also is no evidence that any of Dr. Munk's activities caused the infection to develop. Although the parties disagree whether Aguirre mentioned that he was in pain at the December 6 appointment, Aguirre concedes that he had access to aspirin, so any failure to provide him with a pain reliever did not make a difference. No evidence supports a determination that not ordering pain medication for the inmate who had access to his own pain relievers exposed him to a constitutionally significant health risk. See Toguchi

12

**United States District Court**
For the Northern District of California

1   v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004).

2        Aguirre provides no evidence to support his theory that antibiotics should have been

3   given to him in advance of the January 30 extractions.  He does not dispute that Dr. Munk

4   ordered an antibiotic and pain medication for Aguirre when he did the extractions.   Aguirre

5   contends it took 36 hours for him to get those medicines, but provides no evidence that Dr.

6   Munk had any role in any delay of the medicines he ordered at the time of the extractions.

7   See Walker v. Benjamin, 293 F.3d 1030, 1038 (7th Cir. 2002) (doctor entitled to summary

8   judgment where plaintiff presented no evidence that delays between plaintiff's initial visit,

9   diagnosis and visit to the specialist were within the doctor's control or the doctor was

10  deliberately indifferent to the medical needs or that the delay contributed to plaintiff's

11  injuries; doctor entitled to summary judgment where plaintiff claimed to have not received

12  antibiotics the doctor prescribed for him but failed to produce any evidence showing that the

13  failure was in any way within that doctor's control).

14       Aguirre provides evidence that he turned in requests for dental care in the several

15  weeks following the December 6 visit, but provides no evidence that Dr. Munk was made

16  aware of any of those requests for dental services before he extracted the teeth at the next

17  appointment on January 30.   See id.; see also Hallett v. Morgan, 296 F.3d 732, 745-46 (9th Cir.

18  2002) (plaintiffs could not prove 8th Amendment violation in class action because they "have not

19  demonstrated that delays occurred to patients with [dental] problems so severe that delays would

20  cause significant  harm and that Defendants should have known this to be the case"; district court's

21  finding of no 8th Amendment violation not clearly erroneous where delay for dental care was only

22  three weeks for a hygienist and six weeks for a dentist and less than two days in the event of a dental

23  emergency).

24       Aguirre contends that Dr. Munk failed to determine whether his teeth were abscessed

25  before extracting them on January 30, and "tried to use a seven-day dosage of penicillin to

26  cure any post-extraction infection occurring as a result of extracting abscessed teeth without

27  first killing off the abscesses."  Aguirre Decl., ¶ 28.  Elsewhere he characterizes dental staff

28  as using "abbreviated dosages of low-potency antibiotic," Opposition, p. 12, without any

**United States District Court**
For the Northern District of California

1    evidentiary support.   He offers no competent evidence in support of this assertion.  His

2    evidence actually undermines his position that Dr. Munk did not determine whether his teeth

3    were abscessed before doing the extraction because he states that Dr. Munk did examine his

4    teeth before doing the extractions, and identifies no additional tests that were necessary to

5    determine whether an infection was present.[5]  He asserts that his teeth should have been x-

6    rayed that day, but provides no competent evidence that x-rays are medically necessary the

7    day teeth are extracted – especially when x-rays had been done less than two months earlier.

8    Nor does he present any evidence that the standard of care calls for dentists to "kill off"

9    abscesses before extracting teeth.  Finally, he presents no evidence that the failure to "kill

10    off" the alleged abscess before extraction caused the Ludwig's Angina that later developed.

11    Even if he could prove that some dentists would x-ray teeth the day they extract them and

12    give antibiotics in advance of extractions, that would show a difference of opinion as to

13    which medically acceptable course of treatment should be followed, and that does not

14    establish deliberate indifference.  See Sanchez v. Vild, 891 F.2d at 242.

15         Dr. Bowman: Aguirre presents no evidence to show or support a reasonable inference

16    of deliberate indifference by Dr. Bowman at the CTC on the morning of February 4.  The

17    undisputed evidence shows that Dr. Bowman examined Aguirre and determined that he

18    should be sent to an outside hospital.  Aguirre, who was stable and not in respiratory distress,

19    was on his way to the hospital within about a half-hour of his arrival at the CTC, even

20    allowing the time for Dr. Bowman's consultation with Dr. Adamo.  See Bowman Decl. Ex. 1

21    at 4 ("949 ER" arrival and "1022 out to NMC").

22         The parties disagree as to whether Dr. Bowman cancelled the first request for an

23    ambulance but the disagreement is not material.  Viewing the evidence in the light most

24    favorable to Aguirre, a reasonable trier of fact could conclude that Dr. Bowman cancelled the

25    first request for an ambulance.  However, that cancellation indisputably was inconsequential,

26    as it caused no delay in the transfer of the patient in stable condition.  It is undisputed that

27    Aguirre couldn't depart the prison until a security escort was assembled and it is undisputed

28    that the security escort was not ready until after the second ambulance had arrived to take

14

**United States District Court**
For the Northern District of California

1   Aguirre.  Had the first ambulance not been cancelled, the first ambulance also would have

2   had to wait (for even more time than the second ambulance) as the security team assembled

3   to take the prisoner out of the prison.  Aguirre also presents no evidence to dispute Dr.

4   Bowman's declaration that this uncomfortable but medically stable patient being transported

5   to the hospital 5-30 minutes sooner would have made any difference in the course of care for

6   Aguirre at the hospital.

7          Aguirre asserts that Dr. Bowman misdiagnosed him as having Ludwig's Angina.  He

8   points to hospital records that stated that his infection had an "odontogenic" source and that a

9   culture "did come back Streptococcus viridans and H. flu."  Aguirre Decl., attachment W.

10  The exhibits do not establish his point.   Odontogenic means "oral," which is consistent with

11  an infection in his mouth.  That a hospital record identified the kind of germs on the culture

12  as being Streptococcus viridans and H. flu proves nothing because Ludwig's Angina was

13  described by its location in the body – a mouth floor connective tissue bacterial infection –

14  rather than with reference to the particular kind of bacteria that caused the infection.  Further

15  undermining Aguirre's contention that the document showed that Dr. Bowman misdiagnosed

16  him is the fact that the very same hospital document clearly listed Aguirre's admitting and

17  discharge diagnoses as "Ludwig Angina."  Id.  In other words, the hospital doctors and

18  prison doctors made the same diagnoses.  Aguirre offers no competent evidence to dispute

19  that diagnosis.  Even if Aguirre could show a misdiagnosis, he does not show that it would

20  have made a difference in his care or that it amounted to deliberate indifference.

21         The undisputed evidence also does not show or support a reasonable inference of

22  deliberate indifference by Dr. Bowman after Aguirre returned from the hospital on February

23  13.  Although Aguirre alleged in his unverified amended complaint that he got an infection

24  as a result of having to go back to work, he presents no evidence to support that allegation.

25  No reasonable jury could conclude that Dr. Bowman acted with deliberate indifference when,

26  upon Aguirre's return to prison, Dr. Bowman (1) ordered the same antibiotic and a different

27  pain medication that, his view, had better pain-relieving properties than that called for in the

28  hospital discharge instructions, (2) examined him again 1-2 days later, at which time he (3)

ordered a 7-day lay-in for the inmate, as well as daily dressing changes and daily showers for two weeks.   The selection of a morphine drug instead of the Vicodin mentioned in the hospital discharge order does not show deliberate indifference because there is no evidence on which to find the choice to be medically unacceptable and done in conscious disregard of Aguirre's health.  See Toguchi, 391 F.3d at 1058.  Aguirre's contention that he never "received" the lay-in does not show deliberate indifference because he presents no evidence that Dr. Bowman caused him not to receive the lay-in he ordered in his doctor's notes. Aguirre thinks he should have been kept in the infirmary to be monitored upon his return from the hospital, but he provides no evidence that an infirmary stay was medically necessary.

Dr. Adamo:  Aguirre presents absolutely no evidence that Dr. Adamo failed to properly train or supervise his staff, or that any lack of training or supervision of his staff caused any of Aguirre's injuries.  Aguirre's suggestion that Dr. Adamo had a fiscal austerity program that led to bad dentistry fails to persuade because it lacks any evidentiary support. The only action by Adamo as to which there is any evidence is that, after Dr. Bowman consulted with him on February 4, an ambulance quickly was summoned to take Aguirre to the outside hospital.  There is no deliberate indifference suggested by that sequence of events.

Dr. Lee: As with Dr. Adamo, Aguirre presents absolutely no evidence that the chief medical officer, Dr. Lee, failed to properly supervise or train any physician or dentist, or failed to have in place a supervising nurse on the facility to address emergencies, or that any of Dr. Lee's acts or omissions caused any of Aguirre's injuries.   Aguirre's assertion that Dr. Lee had a fiscal austerity policy that caused the ambulance to be cancelled fails to persuade because it has no evidence to back it up.

Nurse Moses: The court does not evaluate the evidence with regard to nurse Moses because nurse Moses has not appeared in this action, as discussed in section "D" below.

As one studies the evidence, it becomes clear that Aguirre really does not know what caused his Ludwig's Angina, and thrashes about trying to find some fact that might support a

16

theory of liability for defendants.  He has urged many a cause for his bad outcome – including the absence of spit sink, unclean instruments, untreated alleged abscess, lack of antibiotics after December 6 exam, lack of antibiotics before January 30 extractions, low-dose short-course antibiotics after extractions, cancellation of an ambulance for a few minutes, misdiagnosis of Ludwig's Angina, and failure to keep him in the infirmary after he returned from hospital, etc. – but the quickness with which he advances a new theory when defendants show the absence of merit in an earlier one only serves to highlight the speculative nature of Aguirre's case.  To be sure, the evidence establishes that he had numerous dental problems and had a complication after one of the dental procedures.  (And, of course, Aguirre did present evidence that unserved defendant nurse Moses did not respond promptly to his requests for medical and dental care, but presents no evidence that any of the served defendants were alerted to his problem by nurse Moses.)  Establishing that one experienced dental problems and a complication after a dental procedure does not show or support an inference that the health care providers acted with deliberate indifference to the inmate's serious medical or dental needs.  No reasonable jury could overlook this void in his evidence on the subjective prong of his deliberate indifference claim.

Viewing the evidence and all reasonable inferences that may be drawn therefrom in the light most favorable to Aguirre, the court concludes that he has not raised a triable issue of fact that any of the served defendants consciously disregarded a known serious medical need.  No reasonable jury could find that defendants were deliberately indifferent to his medical needs.  Summary judgment will be granted in favor of all served defendants on Aguirre's Eighth Amendment claim.

B.     Qualified Immunity

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The rule of qualified immunity "'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'"  Burns v. Reed, 500

17

U.S. 478, 495 (1991) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)).

In determining whether the defendants are entitled to qualified immunity, the usual first step is to answer this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" <u>Saucier v. Katz</u>, 533 U.S. 194, 194 (2001). If no constitutional right was violated, the inquiry ends and the defendants prevail. As discussed above, the evidence in the record does not raise a triable issue of fact that any served defendant was deliberately indifferent to Aguirre's serious medical needs. The inquiry thus ends and defendants prevail on their qualified immunity defense.

C.    <u>Motion To Dismiss</u>

When defendants moved for summary judgment, they moved in the alternative for dismissal for failure to exhaust administrative remedies as to the claims alleged in the amended complaint, <u>see</u> 42 U.S.C. § 1997e(a). Because the parties did extensive presentations on the motion for summary judgment, the court approached that motion first. If the court had not granted summary judgment for all served defendants, it would grant the motion to dismiss with respect to all the claims except the claims pertaining to the extractions on January 30 and the response to the infection that developed thereafter as only those claims were mentioned in Aguirre's only inmate appeal that received a director's level decision. <u>See</u> Grigg Decl., Ex. B. A decision at the director's level is necessary for a California prisoner to exhaust his administrative remedies under 15 Cal. Code Regs. § 3084.5. <u>See</u> <u>Brodheim v. Cry</u>, 584 F.3d 1262, 1264-65 (9th Cir. 2009).

D.    <u>Miscellaneous Matters</u>

<u>Rebuttal Request</u>: Aguirre's "request leave from procedural default based on justifiable cause" in which he requested leave to file a 22-page rebuttal to defendants' reply brief is DENIED. (Docket # 70.) The court earlier had denied Aguirre's request for an extension of time to file a rebuttal, explaining that a rebuttal to a reply was not contemplated in normal motion practice and one was not necessary here. <u>See</u> March 4, 2011 Order. (Docket # 68.) The court also noted that Aguirre's opposition brief already exceeded the 25-

**United States District Court**
For the Northern District of California

1  page limit for opposition briefs.  Id.  Aguirre had more than three months to prepare his

2  opposition to the motion for summary judgment; he could and should have put all his

3  arguments in his opposition.  Although verified, Aguirre's rebuttal is just 22 pages of

4  additional argument that overwhelmingly repeats that already made in his opposition.  The

5  argument does not become more persuasive by repetition.  Additionally, the request is based

6  on the false premise that the rebuttal was necessary because defendants presented new

7  evidence in their reply.  See Docket # 70, p. 6.  There was no new evidence in defendants'

8  reply.  Any shift in focus between the motion and the reply was responsive to Aguirre's

9  arguments and "evidence" in opposition that were different from the allegations in the

10  amended complaint.  The court has considered the overly-long opposition brief, but denies

11  the request to file a rebuttal brief.

12      Motion To Strike Evidence:  Aguirre's motion to strike some of defendants' evidence

13  is DENIED. (Docket # 64.)  Aguirre challenges several statements in the Bowman and Munk

14  declarations in which the declarants stated their understanding of Aguirre's claims.  There is

15  no reason to think that either declarant lacked personal knowledge of what Aguirre had

16  alleged in his pleadings, as they both are defendants in this action.  Moreover, the declarants'

17  recitation of what they understood Aguirre had alleged was not offered to prove Aguirre's

18  allegations were true, but instead put in context their statements explaining why his

19  allegations were incorrect.  Additionally, statements by the dentist about dental matters and

20  by the doctor about medical matters were within the scope of each declarant's expertise.

21  Without their statements about Ludwig's Angina, there would be no competent evidence

22  from anyone about the nature of that ailment.  An evidentiary gap like that would have

23  worked to Aguirre's detriment because he has the burden to prove his claim at trial and to

24  show a triable issue of fact in support of it at the summary judgment stage.

25      Aguirre also moved to strike Dr. Bowman's description of Aguirre's course of care I

26  the hospital in paragraph 11 of the Bowman declaration.  Although the declarant was not at

27  the hospital when Aguirre was treated, he did not declare that he had been; instead, the

28  paragraph was his description of what the "[r]ecords relating to Mr. Aguirre's hospitalization

United States District Court
For the Northern District of California

show."  Bowman Decl., ¶ 11.  In light of the fact that the declarant is a physician, and had been involved in caring for the patient at the prison just before his departure to the hospital, his statements as to what the hospital records showed about the patient's course of care were not beyond the scope of his knowledge and expertise as a physician.  See Fed. R. Evid. 703.  Medical records are sometimes cryptic, and it is helpful to have someone in the field interpret them for the non-medical audience.  Finally, Aguirre was free to – but did not – offer any argument or evidence that Dr. Bowman was incorrect in interpreting the records.

Unserved Defendant Problem:  As mentioned in the "Background" section and in footnote 1, defendant David Moses is not the R.N. or L.V.N. named "Moses" to whom Aguirre communicated his requests for medical care over the weekend before his hospitalization.  The prison litigation coordinator's office checked, and found only David Moses as the possible match for the "Moses" moniker.  Aguirre does not dispute that David Moses – identified as a Caucasian man who worked in imaging and visited the prison in February 2008 -- is not the African-American nurse named "Moses," nor does Aguirre allege that David Moses had any connection to his dental and medical care.  Accordingly, defendant David Moses is now dismissed from this action as improperly served with process.

In the eight months since defendants informed the court and Aguirre in their motion for summary judgment that David Moses is not the right Moses, Aguirre has provided no further information to find nurse Moses.  Thus, more than two years after the action was filed, nowhere near enough information has been provided to find and serve this defendant.  Although the court can and does have the U.S. Marshal serve process on defendants routinely in in forma pauperis cases, it is the plaintiff's responsibility to provide a name and address for each defendant to be served.  See generally Walker v. Sumner, 14 F.3d 1415, 1421-22 (9th Cir. 1994), overruled on other grounds by Sandin v. Conner, 515 U.S. 472, 483-84 (1995) (prisoner failed to show cause why prison official should not be dismissed under Rule 4(m) because prisoner did not prove that he provided Marshal with sufficient information to serve official or that he requested that official be served).  It is not in the interests of justice to pause this 2-year old action so that plaintiff may begin to hunt for the unserved defendant.

20

1   Nurse Moses is dismissed without prejudice because he was not served within 120 days after

2   the complaint was filed.  See Fed. R. Civ. P. 4(m).  Plaintiff may file a new action against

3   nurse Moses if he ever figures out his real full name and finds him.

4                                        **CONCLUSION**

5            For the foregoing reasons, defendants' motion for summary judgment is GRANTED.

6   (Docket # 35.).  Judgment will be entered (a) dismissing defendant David Moses and (a) in

7   favor of all other defendants.  The clerk shall close the file.

8            IT IS SO ORDERED.

9   DATED: June 1, 2011

10                                           _____
                                             Marilyn Hall Patel
                                             United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**NOTES**

2

3    1.     Although Aguirre presented evidence in his opposition about dental care during
different time periods, the allegations of the amended complaint frame the scope of this
4    action; disputes about other dental care are not within the scope of this action and should be
pursued separately.  Because those other events are outside the scope of the action, the court
5    need not decide whether administrative remedies were exhausted for them.

6    2.     An individual identified only as "licensed vocational nurse Moses" was among the
defendants listed by Aguirre.  Using that name, the Marshal sent a summons and complaint
7    to this defendant at Salinas Valley.  The litigation office at Salinas Valley initially had
difficulty identifying the person because they had no record of anyone with the surname
8    "Moses" who had worked at the prison.  The litigation office located a man named David W.
Moses, who had been in the prison for a meeting with the chief medical officer in February
9    2008, during which some of the events alleged in the amended complaint took place.  The
litigation office thus sent David Moses a request for representation form, which eventually
10   was signed and returned to the ligation office and forwarded to counsel.  "After getting input
from medical staff," the litigation office eventually came "to the conclusion that David
11   Moses is not the 'Moses' Plaintiff intended to sue."  Esparza Decl., ¶ 4.  Esparza explained
that David Moses is Caucasian (rather than the African American man Aguirre and his
12   witnesses identified), and worked for an imaging company rather than at the prison.  Id. at ¶
5.  Aguirre has not disputed the evidence about defendant Moses.  Nurse Moses was never
13   located or served with process.  As will be explained later in this order, David Moses will be
dismissed and the claims against the unserved nurse Moses will be dismissed without
14   prejudice.

15   3.     Aguirre misreads the priorities in his attachment C-1, which is a copy of 15 Cal. Code Regs. sec.
3354.  Section 3354(f) listed the scheduling priorities for dental care as "emergency care" which meant
16   immediate treatment, three types of urgent care – 1A (treatment within 24 hours), 1B (treatment within
30 days), and 1C (treatment within 60 days), and "interceptive care" which meant treatment within 120
17   days.  The failure to comply with the regulation's scheduling guideline does not establish an Eighth
Amendment violation.

18

19   4.     Aguirre alleged in his unverified amended complaint that the swelling and difficulty swallowing
and fever started "within hours of the extractions," Amended Complaint at 5, but stated in his
20   declaration and deposition that the problems started about two days after the extractions.

21   5.     In his verified complaint, Aguirre alleged that he brought to Dr. Munk's attention his abscess
and that "Munk examined the abscess and (noted) in the plaintiff's dental records."   Complaint, p. 5.
22   The dental note attached to the original complaint is the one in which Dr. Munk notes a mandibular toris
near the site of tooth # 27.  See Complaint, Ex. A at 12/6/07 progress notes.

23

24

25

26

27

28

**United States District Court**
For the Northern District of California